SSS:PP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – X
IN THE MATTER OF THE SEARCH OF:

THE PREMISES KNOWN AND DESCRIBED AS
30-35 49th STREET, APT #3N, ASTORIA, NY
11103
– – – – – – – – – – – – – – – – – – – – – X

**APPLICATION IN SUPPORT
OF A SEARCH WARRANT**

**19-M-820**

        I, DAMON GERGAR, being first duly sworn, hereby depose and state as

follows:

## **INTRODUCTION AND AGENT BACKGROUND**

        Upon information and belief, there is probable cause to believe that there is

kept and concealed within 30-35 49th STREET, APT #3N, ASTORIA, NY 11103, the items

described in Attachment A to this affidavit, all of which constitute evidence or

instrumentalities of the possession, access with intent to view, transportation, receipt,

distribution and reproduction of sexually explicit material relating to children, in violation

of Title 18, United States Code, Sections 2252 and 2252A.

        The source of your deponent's information and the grounds for his belief are

as follows:[1]

        1.      I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the premises known as 30-35

---

[1]     Because this affidavit is submitted for the limited purpose of establishing probable cause
for a search warrant, I have not set forth each and every fact learned during the course of the
investigation.

49th STREET, APT #3N, ASTORIA, NY 11103 (the "PREMISES"), further described in Attachment A, for the things described in Attachment B.

2.      I am a detective employed by the New York City Police Department, and I have been a police officer for 19 years.  I have been a detective for over 10 years, including being assigned to the Vice Major Case Squad for approximately 8 years and a Task Force Officer for 2 years with Border Enforcement Security Task Force with the Department of Homeland Security.  My responsibilities include investigations of cases involving the promotion of a sexual performance by a child through the use of electronic devices and the Internet, possession and distribution of child pornography through the use of electronic devices and the Internet, as well as dissemination of indecent material to minors, and other incidents of the exploitation of children on the internet.  I have gained expertise in this area through training in classes and daily work related to conducting these types of investigations.  As part of my responsibilities, I have been involved in the investigation of numerous child pornography and child exploitation cases.

3.       I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from: my personal participation in the investigation, my review of documents, my training and experience, and discussions I have had with other law enforcement personnel concerning the creation, distribution and proliferation of child pornography.  Additionally, statements attributable to individuals herein are set forth in sum and substance and in part.

4.      Homeland Security Investigations ("HSI") is investigating the possession, access with intent to view, transportation, receipt, distribution and reproduction

of sexually explicit material relating to children, in violation of Title 18, United States Code, Sections 2252 and 2252A.

5.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## DEFINITIONS AND BACKGROUND

6.     For the purposes of the requested warrant, the following terms have the indicated meaning in this affidavit:

    a.    The terms "minor," "sexually explicit conduct," and "visual depiction" are defined as set forth in Title 18, United States Code, Section 2256.

    b.    The term "child pornography" is defined in Title 18, United States Code, Section 2256(8), in pertinent part, as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where . . . the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct. . . ."[2]

    c.    The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, server computers, and network hardware, as well as wireless routers and other hardware involved in network and Internet data transfer.

    d.    The term "Internet" refers to a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international

---

[2]     See also Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002) (analyzing constitutional validity of the definitions set forth in 18 U.S.C. § 2256(8)).

borders, even when the devices communicating with each other are in the same state.

e.    The term "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

**PROBABLE CAUSE**

7.    On September 5, 2019, I and other law enforcement officials arrested Jason Seto for attempted coercion and enticement of a minor to have sex, in violation of Title 18, United States Code, Section 2422(b).  (19-MJ-795).  The Complaint in support of that arrest is incorporated herein and attached as Exhibit A.

8.    As set forth in more detail in that complaint, from on or about August 21, 2019 through September 5, 2019, I communicated in an undercover capacity with Jason Seto.  I told Seto that I was a 14-year-old boy.  The defendant stated that was the "perfect age."  As described in Exhibit A, Seto repeatedly attempted to coerce and entice me to have sex with him.  After learning and believing that I was 14, the defendant repeatedly discussed the sexual acts he wanted to do with me.  As just one example, the defendant said, "I want to stand up and have u on ur knees sucking me while u call me daddy."  On September 5, 2019, Seto was arrested when he attempted to meet up with the individual he believed was 14 years old.

9.    As part of those communications, Seto discussed viewing child pornography.  He called it "underground porn. Not legal lol.  Young boys and girls getting fucked by dads."  He asked me if I would "get turned on seeing a dad fuk his young son."

10.     On September 6, 2019, the Honorable Roanne L. Mann, United States Chief Magistrate Judge, signed a search warrant for Seto's cell phone.  (19-MJ-800).  A search of that phone showed that Seto receives child pornography and that it is probable that child pornography is located at the PREMISES.  For example, in one July 2019 conversation, Seto and another individual discussed pornography involving "young and old," and "boy or girl" videos, including "hairless" pornography, and pornography involving "boys" with "small ass."  At one point, the other individual explicitly refered to what they are discussing as "CP," which I know to mean child pornography.  Seto stated that he watches this type of pornography "on my laptop through a flash drive only."  Seto stated in this conversation that he is "super careful."  Seto discussed how someone taught him how to get videos from the "dark web."  Based on my training and experience, I know that collectors of child pornography often use the dark web to download child pornography.

11.     In addition, in another conversation with a different individual, Seto again referenced having child pornography on a flash drive.

12.     Based on my training and experience, individuals who watch and keep child pornography usually do so at their residence.  And based on my review of the conversations and my training and experience, I believe that the laptop and the flash drive are likely located at the PREMISES.

## THE PREMISES

13.     The PREMISES is located on the third floor of a multistory residential building in Queens, New York.  There are numbers, "30-35", above the entrance door to the residential building.  The door to the PREMISES is white in color.  At the top of the door is

the lettering, "3N." Pictures of the outside of the residential building and the PREMISES are included in Attachment A.

14.     Seto listed the PREMISES as his address after his arrest. In addition, Seto stated that he currently lives alone.

## CHARACTERISTICS OF COLLECTORS OF CHILD PORNOGRAPHY

15.     Based on my training and experience and conversations that I have had with other federal agents and law enforcement officers, I know that child pornography is not readily available in retail establishments. Accordingly, individuals who wish to obtain child pornography do so usually by ordering it from abroad or by discreet contact, including through the use of the Internet, with other individuals who have it available or by accessing web sites containing child pornography. Child pornography collectors often send and receive electronic mail conversing with other collectors to solicit and receive child pornography.

16.     I know that collectors of child pornography typically retain their materials and related information for many years.

17.     I also know that collectors of child pornography often maintain lists of names, addresses, telephone numbers and screen names of individuals with whom they have been in contact and who share the same interests in child pornography.

18.     Accordingly, information in support of probable cause in child pornography cases is less likely to be stale because collectors and traders of child pornography are known to store and retain their collections and correspondence with other collectors and distributors for extended periods of time.

19.     Based on my experience, I know that persons who collect and distribute child pornography frequently collect sexually explicit materials in a variety of media, such as photographs, magazines, motion pictures, video tapes, books, slides and/or drawings or other visual media that they use for their own sexual arousal and gratification.

20.     Further, based on my training, knowledge, experience, and discussions with other law enforcement officers, I understand that, in the course of executing a search warrant for the possession, transportation, receipt, distribution or reproduction of sexually explicit material related to children, on numerous occasions officers have recovered evidence related to the production of child pornography and/or child exploitation.

## TECHNICAL BACKGROUND

21.     As described above and in Attachment B, this application seeks permission to search for documents constituting evidence, fruits or instrumentalities of violations of Title 18, United States Code, Sections 2252 and 2252A that may be found in the PREMISES, in whatever form they are found.  One form in which the documents may be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of computers and electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure.

22.     I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space — that is, in space on the storage medium that is not currently being used by an active file — for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media — in particular, the internal hard drives of computers — contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  For example, this forensic evidence can take the form of operating system configurations, artifacts from the use of an operating system or application, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

        d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

        23.     As further described in Attachment B, this application seeks permission to locate not only electronic computer files that may serve as direct evidence of the crimes described on the warrant but also electronic "attribution" evidence that establishes how the computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any computer or storage medium in the PREMISES because:

        a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

        b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing

a search warrant at a residence.  For example, registry information, Internet search histories, configuration files, user profiles, email, email address books, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

        c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how the computers were used, the purpose of their use, who used them, and when.

        d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Whether data stored on a computer is evidence may depend on the context provided by other information stored on the computer and the application of knowledge about how a computer functions.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular item is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

        24.     In most cases, a thorough search for information that might be stored on computers and storage media often requires agents to seize such electronic devices and

later review the media consistent with the warrant.  This is true because of the time required for examination, technical requirements, and the variety of forms of electronic media, as explained below:

        a.    <u>The time required for an examination</u>.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site.  Analyzing electronic data for attribution evidence and conducting a proper forensic examination requires considerable time, and taking that much time on the PREMISES could be unreasonable.  Given the ever-expanding data storage capacities of computers and storage media, reviewing such evidence to identify the items described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

        b.    <u>Technical requirements</u>.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        c.    <u>The variety of forms of electronic media</u>.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

25.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would authorize seizing, imaging or otherwise copying computers and storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including, but not limited to, computer-assisted scans of the entire medium, that may expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.  Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the Electronically Stored Information ("ESI") from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

26.     Although it does not appear that anyone else lives at the PREMISES besides Seto, because several people may share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If agents conducting the search nonetheless determine that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

27.     If the government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the government will return

these items, upon request.  Computer data that is encrypted or unreadable will not be

returned unless law enforcement personnel have determined that the data is not (i) an

instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv)

otherwise unlawfully possessed, or (v) evidence of the crimes discussed herein.

## **CONCLUSION**

28.     Based on my training and experience, and the facts as set forth in this

affidavit, there is probable cause to believe that on the PREMISES there exists evidence of

one or more crimes.  Accordingly, a search warrant is requested.

WHEREFORE, your deponent respectfully requests that the requested search

warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS 30-35 49th

STREET, APT #3N, ASTORIA, NY 11103.

S/ Damon Gergar
_____
DAMON GERGAR
Task Force Officer
United States Department of Homeland Security,
Homeland Security Investigations

Sworn to before me this
12th day of September, 2019

S/ Lois Bloom
_____
THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

**ATTACHMENT A**
Property to Be Searched

30-35 49th STREET, APT #3N, ASTORIA, NY 11103 (the "PREMISES").

The PREMISES is located on the third floor of a multistory residential building in Queens,

New York.  There are numbers "30-35" above the entrance door to the residential building.

The door to the PREMISES is white in color.  At the top of the door is the lettering, "3N."

 

**ATTACHMENT B**
Property to be Seized

ITEMS TO BE SEIZED FROM THE PREMISES, all of which constitute evidence or instrumentalities of violations of Title 18, United States Code Sections 2252 and 2252A:

1.  Images of child pornography and files containing images of child pornography and records, images, information or correspondence pertaining to the possession, access with intent to view, receipt and distribution of sexually explicit material relating to children, in violation of Title 18, United States Code, Sections 2252 and 2252A, in any form wherever they may be stored or found;

2.  Books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

3.  Originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

4.  Motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

5.  Records, information or correspondence pertaining to the possession, access with intent to view, transportation, receipt, distribution and reproduction of sexually explicit material relating to children, as defined in 18 U.S.C. § 2256, including, but not limited to:

    a.  envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

    b.  books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

3

6.      Billing and payment records, including records from credit card companies, PayPal and other electronic payment services, reflecting access to websites pertaining to child pornography.

7.      Computer-related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

8.      Records evidencing occupancy or ownership of the PREMISES, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence.

9.      Records or other items which evidence ownership or use of computer equipment found in the PREMISES, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

10.     Address books, mailing lists, supplier lists, mailing address labels and any and all documents and records pertaining to the preparation, purchase and acquisition of names or lists of names to be used in connection with the purchase, sale, trade or transmission of any visual depiction of minors engaged in sexually explicit conduct.

11.     Materials and photographs depicting sexual conduct between adults and minors or used in sexual conduct between adults and minors.

12.     Any and all records, documents, invoices and materials that concern any Internet accounts used to possess, receive or distribute child pornography.

13.     Computers[1] or storage media[2] that contain records or information (hereinafter "COMPUTER") used as a means to commit violations of 18 U.S.C. §§ 2252 and 2252A.  All information obtained from such computers or storage media will be

---

[1]      A computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, servers, and network hardware, such as wireless routers.

[2]      A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded.  Examples include external hard drives, CDs, DVDs and flash drives.

maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution. The information shall be reviewed by the government only for the purpose of identifying and seizing information that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 2252 and 2252A, including:

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.      evidence of the times the COMPUTER was used;

g.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.      documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and

i.      contextual information necessary to understand the evidence described in this attachment.

17.      During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein, all of which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2252 and 2252A.

# EXHIBIT A

AB:PP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -

JASON SETO,

           Defendant.

– – – – – – – – – – – – – X

COMPLAINT

(T. 18, U.S.C., § 2422(b))

19-MJ-795

EASTERN DISTRICT OF NEW YORK, SS:

    DAMON GERGAR, being duly sworn, deposes and states that he is a Detective with the New York City Police Department and Task Force Officer with the Border Enforcement Security Task Force with the Department of Homeland Security, duly appointed according to law and acting as such.

    In or about August 21, 2019 through September 5, 2019, within the Eastern District of New York and elsewhere, the defendant JASON SETO did, using the mail or a facility or means of interstate commerce, knowingly attempt to persuade, induce, entice, or coerce any individual who has not attained the age of 18 years to engage in any sexual activity for which any person can be charged with a criminal offense.

    (Title 18, United States Code, Section 2422(b)).

    The source of your deponent's information and the grounds for her belief are as follows[1]:

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I

1.      I am a detective employed by the New York Police Department and I have been a police officer for 19 years. I have been a detective for over 10 years, including being assigned to the Vice Major Case Squad for approximately 8 years and a Task Force Officer for 2 years with Border Enforcement Security Task Force with the Department of Homeland Security.   My responsibilities include investigations of cases involving the promotion of a sexual performance by a child through the use of electronic devices and the internet, possession and distribution of child pornography through the use of electronic devices and the internet, as well as dissemination of indecent material to minors, and other incidents of the exploitation of children on the internet.   I have gained expertise in this area through training in classes and daily work related to conducting these types of investigations. As part of my responsibilities, I have been involved in the investigation of numerous child pornography and child exploitation cases.

2.      I have personally participated in the investigation of the offenses discussed below.   I am familiar with the facts and circumstances of this investigation from: my personal participation in the investigation, my review of documents, my training and experience, and discussions I have had with other law enforcement personnel.   Additionally, statements attributable to individuals herein are set forth in sum and substance and in part.

3.      On or about August 21, 2019, I began working in an undercover capacity via an Internet-connected smartphone to conduct an investigation into individuals attempting to have sex with underage boys.   I initially was contacted by an individual, who I later determined was the defendant, JASON SETO, on a dating application which individuals

---

am aware.

primarily use to meet up to have sexual contact.   The defendant sent me a picture of himself, which included his face, as well as a picture of his penis.   Within approximately 15 minutes of talking to the defendant, I told him I was 14 years old.   The defendant responded "cool," and continued talking to me.   The defendant asked if I liked "older."   The defendant said he was my "daddy" and that I was "[his] son."   The defendant asked if I like giving and receiving oral sex.   Also on that day, the defendant asked if I was free to meet up.

4.   The defendant JASON SETO requested that we continue the conversation on Telegram, an encrypted chat application, which we did.   Once on the Telegram application, he said it was "better to chat on here."   Later the defendant stated "We have to both delete the convos each time this app is super private and that's why I suggested . . . . u get it.   It's encrypted."

5.   The defendant JASON SETO also asked "so can u keep us a secret," and when I responded I said I could, he said "cool ... I have to ask to make sure ur down."   He then said that he wanted to give me oral sex, kiss me, and "can't wait until u suk me ... u gonna like daddy's dick."   Conversations of this nature between myself and the defendant continued repeatedly, even after I again said that I was 14 years old.   At one point shortly after saying that I was 14, the defendant responded "I like young."   The defendant also said "I want ur boy dick."   When I responded "I'm not 5.   I'm 14," the defendant responded "I like . . . perfect age."

6.   The defendant JASON SETO repeatedly expressed interest in meeting up with me.   When I asked what he wanted to do when we meet up, he responded, "Get to know, kiss and suk dick."   The defendant later said he wanted to engage in intercourse with

me. The defendant repeatedly discussed what sexual acts he would do with me when we met up. For example, on another occasion, the defendant stated "I want to stand up and have u on ur knees sucking me while u call me daddy." As another example, the defendant said "I want u to get naked and sit back and let me suk u. Yeah I want to please until u cum."

7. The defendant JASON SETO also requested that I send nude photos of myself. When I hesitated, the defendant replied "I'm not asking u to send ur face in it and honestly I been giving u my trust and I deserve some back." At one point, the defendant referred to the fact that I had already seen his penis.

8. The defendant JASON SETO discussed how he wanted us to watch child pornography when we met up. The defendant said he watched liking pornography of boys "younger" than me, i.e., younger than 14 years old. The defendant sent me four videos during the course of our conversations. Although the ages of the individuals in the video are not clear, based on my training and experience, it appears that at least one of the videos may be of an underage boy. During the course of our conversations, the defendant said he wanted to watch these types of videos with me.

9. Law enforcement officials determined, using the photograph of the defendant JASON SETO's face that he sent me and comparing it with known photographs of the defendant, that the photograph the defendant sent me was of a JASON SETO. In addition, during our conversations, the defendant used the alias "Carlos Sanchez" as his username. Eventually I asked if Carlos was his real name, and the defendant replied, "Jason Carlos."

10.     When talking on the dating application, the defendant JASON SETO

sent me the GPS coordinates of where he was located in Queens, NY.   The coordinates were

less than .4 miles from the defendant's home address, in Astoria in Queens.   In addition,

when I told the defendant I was near LaGuardia Airport, he said "ur super close to me . . ."

The defendant's address is approximately 2.5 miles from LaGuardia Airport.

11.     The defendant JASON SETO repeatedly asked when we could meet up.

For example, on August 23, 2019, he said "so can we chill next week what u think?"   When

asked what he would want to do when we met up, he said "Get to know, kiss and suk dick."

On August 24, 2019, he wrote "What is really important to me is that me seeing u make time

for us next week so we can see each other."   At one point, when I said that I usually resided

in the Dominican Republic, the defendant offered to fly down there to see me.   On September

5, after two weeks of discussing the sexual acts he wanted to do with me, and just one day

earlier saying to me "I want to suck u and be sucked," the defendant and I discussed where we

could meet up the next day.   I asked if we could meet at the Five Guys at LaGuardia Airport.

The defendant stated after we met "we can head back to my place."   We eventually planned

to meet at approximately 6:00 p.m.   At 5:36 p.m., the defendant texted me that he could meet

up in thirty minutes or less.

12.     On September 5, 2019, at approximately 5:50 p.m., law enforcement

officers observed the defendant JASON SETO leaving his residence in Astoria.   At

approximately 6:07 p.m., law enforcement officers observed the defendant arrive at

LaGuardia Airport.   The defendant messaged me asking where I was, and I said I was in the

bathroom.   Law enforcement officers then observed the defendant go to the bathrooms at

6

LaGuardia Airport. I then messaged the defendant that I was at the Five Guys, the restaurant where we originally planned to meet. Law enforcement officers then observed the defendant go to the Five Guys. When he entered the Five Guys, I and other law enforcement officers placed the defendant under arrest.

13. After his arrest, I read the defendant JASON SETO his Miranda rights, which he waived, and he signed a Miranda waiver form. The defendant then admitted that he was the one talking to an individual who said he was 14 years old.

14. During his Mirandized post-arrest interview, the defendant JASON SETO gave me consent to search the phone in his possession for the chats with the individual he believed to be 14 years old. The defendant's phone contained the chats that I had with him on the Telegram application where he attempted to entice me, posing a 14-year-old boy, to have sex.

WHEREFORE, your deponent respectfully requests that the defendant JASON SETO be dealt with according to law.

*Det. D-8 4207*

DAMON GERGAR
Task Force Officer
United States Department of Homeland Security,
Homeland Security Investigations

Sworn to before me this
6th day of September, 2019

THE HONORABLE ROANNE L. MANN
CHIEF UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK